UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SCHUH HAULING, INC.,

    Plaintiff,

v.                                                     Case No. 05-C-0268

LAND O' LAKES, INC., *et al.*,

    Defendants.

---

## DECISION AND ORDER

---

      Plaintiff Schuh Hauling, Inc., sued Defendant Land O' Lakes, Inc., for breach of contract in the Outagamie County Circuit Court. Land O' Lakes subsequently removed the case to this court on the basis of diversity jurisdiction, *see* 28 U.S.C. § 1332, and Schuh filed an amended complaint naming Northwest Food Products Transportation LLC, as an additional defendant.[1] Land O' Lakes thereafter filed a counterclaim seeking a declaration that Schuh had breached the contract between the parties and that Land O' Lakes had properly terminated the contract thereupon. In the alternative, Land O' Lakes sought a declaratory judgment that it had properly terminated the contract between the parties at the end of its term on October 30, 2004. Land O' Lakes also sought indemnification for its attorney's fees in this case. The parties have now filed cross motions for summary judgment. For the following reasons, Schuh's motion will be granted in part and denied in part, and Land O' Lakes' motion will be granted in part and denied in part.

---

      [1]In its amended complaint, Schuh alleges that Land O' Lakes assigned all or part of its contractual rights to NFPT. Schuh does not support these allegations in its summary judgment filings. The court will therefore refer to the parties to the contract as "Schuh" and "Land O' Lakes."

**BACKGROUND**

On October 30, 1995, Land O' Lakes and Schuh Milk Services, Inc.,[2] entered into an Independent Contractor Milk Hauling Agreement. (PPFOF ¶ 13.) The Agreement was a standard form drafted by Land O' Lakes for use with all of its contract haulers or carriers. (PPFOF ¶ 14.) Under the Agreement, Schuh contracted "to pick up, transport and deliver milk from Land O' Lakes producers to Land O' Lakes at a site or sites as may be designated by Land O' Lakes from time to time." (Nordtvedt Aff., Ex. A § 1.) The Agreement was to run for a term of one year; renewal for additional terms of one year was automatic unless either party gave "thirty (30) days' prior written notice by certified mail, return receipt requested, of its intention" to terminate the agreement at the end of a term. (*Id.* § 12.) The Agreement also permitted Land O' Lakes "to terminate [it] at any time upon breach by [Schuh]." (*Id.* § 11.)

Section 3 of the Agreement lists a series of obligations carrier agreed to perform that were considered "material terms of this Agreement." The first obligation listed reads:

> Carrier acknowledges the high standards and goodwill associated with Land O' Lakes and its producers' milk and agrees to safeguard the interest of Land O' Lakes and refrain from any conduct which would lessen the image of Land O' Lakes or its producers.

(Nordtvedt Aff., Ex. A § 3.1.)

Among the additional obligations listed, the Agreement required Schuh to "ensure that all tanks are sanitized and washed prior to loading milk" (*id.* § 3.3), to "[b]e familiar with and strictly observe all applicable statutes, ordinances, rules and regulation[s] of state and local health departments, state

---

[2] The parties dispute whether Schuh Milk Services, Inc., is a separate corporation from Schuh Hauling, Inc. (the plaintiff in this case), which assigned its rights under the Agreement to Schuh Hauling in 2004, or whether the plaintiff has only a single corporate identity. The dispute is not relevant to this motion; the court will refer to the plaintiff and any predecessors-in-interest as "Schuh."

agricultural departments, state and federal commerce commissions and of every other governmental agency having jurisdiction of any operation under th[e] Agreement" (*id.* § 3.7), and to "[c]omply with all policies, rules, and regulations issued from time to time by Land O' Lakes relating to the pickup, transportation, and unloading of milk." (*Id.* § 3.9.) The Agreement also required Schuh to "indemnify and hold harmless Land O' Lakes from and against any and all claims, demands, actions, causes of action, losses, liabilities and cost (including reasonable attorney's fees) arising out of or attributable to the conduct, operations or performance of [Schuh]." (*Id.* § 7.) The Agreement provided that it was to be governed and construed in accordance with Minnesota law. (*Id.* § 18.)

The record is silent as to any problems between the parties between the inception of their relationship and the beginning of 2004. On January 14, 2004, however, Schuh driver Jason Propson presented a false cleaning tag to Land O' Lakes' employees at its Kiel manufacturing plant. (DPFOF ¶¶ 19-20.) The milk in the tanker was scheduled to be delivered to one of Land O' Lakes' out-of-state customers; however, after discovering the false cleaning tag, Land O' Lakes had to cancel the delivery. (DPFOF ¶¶ 21-22.)

On August 16, 2004, the Wisconsin Department of Agriculture, Trade, and Consumer Protection notified Land O' Lakes that a dairy farm operated by one of its producers, Kip Klawitter, was being downgraded to a "Grade B" dairy because of a high somatic cell count in the milk produced by its cows. (DPFOF ¶ 23.) Klawitter's dairy farm was on a milk route handled by Schuh. (DPFOF ¶ 25.) A Land O' Lakes employee thereafter telephoned Schuh to notify it of the Department of Agriculture's action. (PPFOF ¶ 50; DPFOF ¶ 26.) Nevertheless, on September 2, 2004, Schuh identified the Grade B milk it picked up from Klawitter's farm as Grade A milk on a milk receipt. (DPFOF ¶¶ 34-35.) Schuh presented the milk receipt to the workers at Land O'

3

Lakes' Kiel plant, who proceeded to pump the Grade B milk into a Grade A tank. (DPFOF ¶¶ 36-37.)

One of Land O' Lakes' customers is the Mideast Milk Marketing Agency, which resells the Grade A milk that it purchases from Land O' Lakes to a number of dairies, including the East Side/Prairie Farms bottling plant in Anderson, Indiana. (DPFOF ¶ 40.) Because it bottles milk for sale to consumers, the Anderson plant cannot receive Grade B milk. (DPFOF ¶ 41.) Each month, Land O' Lakes provides its haulers with a schedule indicating how much milk has to be delivered to the Anderson plant. (DPFOF ¶ 43.) The haulers then divide up the schedule and notify Land O' Lakes which loads they want to deliver, determining for themselves which milk routes to use to fill the tankers. (DPFOF ¶ 44.)

On September 8, 2004, Schuh agreed to take a load of Grade A milk to the Anderson plant. (DPFOF ¶ 45.) To fill the tank for the Anderson load, Schuh selected the route that included the Klawitter dairy farm. (DPFOF ¶ 46.) As a result, Schuh commingled Grade B milk from the Klawitter farm with the Grade A milk that it picked up from the other farms on the route. (DPFOF ¶¶ 47-48.) Schuh identified the milk on the milk receipt as Grade A milk. (DPFOF ¶ 50.) Schuh presented the milk receipt to the intake workers at the Kiel plant. (DPFOF ¶ 53.) Based on the incorrect milk receipt, the intake workers prepared a bill of lading identifying the load as Grade A milk. (DPFOF ¶ 54.) The bill of lading and the load of milk were then delivered to the Anderson plant. (DPFOF ¶¶ 55.)

On September 23, 2004, Land O' Lakes' representatives, Roger Nordtvedt and William D. Hazer, met with Schuh's vice-president, Barry Schuh. (PPFOF ¶ 67; DPFOF ¶ 63.) Nordtvedt personally handed Schuh a letter purporting to terminate the Agreement, effective immediately.

(PPFOF ¶ 70; DPFOF ¶ 66.) The letter was addressed to Evan Schuh, Schuh's president. (Nordtvedt Aff., ¶ H.) It read, in substance, as follows:

> Please consider this a written termination notice for breach provided for in Section 11 of the Independent Contractor Milk Hauling Agreement from Land O' Lakes. It has come to our attention that your company caused degraded patron to be placed on a grade A load and transported to a bottling plant in Indiana. This degraded patron was placed into a silo and has caused severe damage to Land O' Lakes' property, product, and potentially its reputation. As a result, you have breached various provisions of the Milk Hauling Agreement including and not limited to, obligations contained in sections 3.1, 3.7, 3.8, and 3.9. Thus, your Independent Contractor status is terminated effective immediately.

(*Id.*) This lawsuit ensued.

## ANALYSIS

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Wantz v. Experian Information Sol.*, 386 F.3d 829, 832 (7th Cir. 2004); Fed. R. Civ. P. 56. Summary judgment can be particularly appropriate in contract actions where the disposition of the case involves the interpretation of a contract *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 771-72 (7th Cir. 2000). The construction of a contract is a question of law. *Elkhart Lake's Road Amer. v. Chicago Hist. Races*, 158 F.3d 970, 972 (7th Cir. 1998). Where the terms of a contract are clear and unambiguous, the court must interpret it according to its literal terms. *Gorton v. Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 622-23 (Wis. 1998). But when the terms of the contract are reasonably susceptible to more than one construction, the contract is ambiguous and the court attempts to ascertain the intent of the parties. *Id.* Yet, even when a term or provision is ambiguous, the issue presented is still one of law, unless the ambiguity must be resolved by considering facts

5

that are extrinsic to the contract itself and the evidence relating to those facts is in dispute. *Walgreen Co. v. Sara Creek Property Co.*, 775 F. Supp. 1192, 1195 (E.D. Wis. 1991), *aff'd*, 966 F.2d 273 (7th Cir. 1992). When no facts relating either to the meaning of the contract or the conduct of the parties thereunder are in dispute, however, and the only question to be decided is what rights the contract affords the parties in light of those facts, there is no need for a trial. This is such a case.

Land O' Lakes first alleges that Schuh breached the Agreement when Propson presented a false wash tag at the Kiel plant on January 14, 2004. Even assuming that this is so, however, Land O' Lakes clearly waived its right to terminate the contract on the basis of this breach. Land O' Lakes continued to perform under the contract until September 23, 2004. "A party's continued recognition of a contract as binding after the other party's alleged breach acts as a waiver of that breach." *Creative Communications Consultants, Inc. v. Gaylord*, 403 N.W.2d 654, 657 (Minn. Ct. App.1987) (internal citation omitted). Land O' Lakes' continued performance under the Agreement long after the incident involving the false wash tag waived any right to terminate that Land O' Lakes may have had as a result of this alleged breach.

Land O' Lakes next argues that Schuh breached the Agreement when its drivers presented milk receipts incorrectly identifying the milk in their tankers as Grade A (rather than Grade B) milk on September 2 and September 8, 2004. As noted above, under the terms of the Agreement, Schuh was to "be familiar with and strictly observe all applicable statutes, ordinances, rules and regulations of state and local health departments, state agricultural departments, state and federal commerce commissions and of every governmental agency having jurisdiction of any operation of this agreement." (Agreement § 3.7.) A regulation issued by the Wisconsin Department of Agriculture, Trade and Consumer Protection prohibits a dairy plant operator from receiving milk from a farm

without a current Grade A permit as Grade A milk. Wis. Adm. Code § ATCP 80.20(2)(a). Similarly, a Wisconsin statute requires dairy plants to maintain separate facilities for receipt, transfer and processing of milk that is not Grade A milk. Wis. Stat. § 97.20(3)(b). By delivering Grade B milk to the Kiel plant that it incorrectly identified as Grade A milk, Land O' Lakes argues that Schuh violated these provisions and thereby breached the Agreement.

Schuh argues in response, however, that neither the statute nor the regulation cited by Land O' Lakes apply to it. The statute governs the conduct of a dairy plant which is defined as "any place where a dairy product is manufactured or processed for sale or distribution, and includes a receiving station or transfer station"–which does not include Schuh. Wis. Stat. § 97.20(1)(a). And the regulation Land O' Lakes accuses Schuh of violating applies to dairy plant operators. Under Wis. Admin. Code § ATCP 80.01(6), "'[d]airy plant operator' means a person who operates a dairy plant and who is required to be licensed under s. ATCP 80.02 (1)." Schuh does not fall within this definition, since it does not operate a dairy plant. Thus, Schuh claims it's misstating the milk classification did not violate any "applicable statutes, ordinances, rules and regulations" and does not constitute a breach of the Agreement.

I find Schuh's interpretation of its obligations under the Agreement strained. As its first obligation under the Agreement Schuh "acknowledge[d] the high standards and goodwill associated with Land O' Lakes and its producer's milk and agreed to safeguard the interest of Land O' Lakes and refrain from any conduct which would lessen the image of Land O' Lakes and its producers." (Agreement § 3.1.) In light of this provision, I conclude that the duty to "be familiar with and strictly observe all applicable statutes, ordinances, rules and regulation of state and local health department, state agricultural department, state and federal commerce commissions and of every other governmental agency having jurisdiction of any operation under this agreement" required

7

more than Schuh's compliance with only those rules and regulations that apply to haulers. It at least required Schuh not to misstate the milk classification so as to cause Land O' Lakes to violate state statutes and regulations governing the handling of Grade A milk. Indeed, given the strict rules and regulations governing the handling of Grade A milk, and the potential damage that can occur to a dairy that violates those rules, *see* Wis. Stat. § 97.72, it is clear that such conduct can endanger the very business of the dairy. By misstating the milk classification and causing Land O' Lakes to violate applicable state statutes and regulations, I conclude that Schuh breached these provisions of the Agreement.

The Agreement also required Schuh to "[c]omply with all policies, rules and regulations issued from time to time by Land O' Lakes relating to the pickup, transportation and unloading of milk." (Agreement § 3.9.) Land O' Lakes' written Receiving Area Rules state that "all drivers must work with regulatory rules" and, more specifically, "[m]ust follow all rules set by the state of Wisconsin and Land O' Lakes for sanitation, receiving, sampling, and safety." ( Hodgkiss Aff., Ex. B at 97.) Thus, even though the state statutes and regulations governing the handling of milk by dairy plants and dairy plant operators do not by their terms apply to Schuh, Schuh was nevertheless bound by them by operation of the Agreement.

Finally, the record also establishes that Schuh violated a "rule . . . relating to the pickup of milk" when it intermingled milk from the Klawitter farm with Grade A milk from other producers and incorrectly identified the grade on the receipt after Land O' Lakes notified it of the downgrading of the farm. A rule is simply "a prescribed guide for conduct or action," *Merriam-Webster's Collegiate Dictionary* at 1023 (10th ed. 1999), and nothing in the Agreement requires every "rule" to be in writing. Here, it is undisputed that shortly after Land O' Lakes received notice from the Wisconsin Department of Agriculture that the Klawitter farm had been downgraded to a "Grade B"

8

dairy, Tony Betley, the Land O' Lakes field representative for Klawitter, telephoned Schuh, advised it of the downgrade, and instructed Schuh that Klawitter "is to be picked up on Grade B until further notified." (*Id.* at 43.) Betley's instruction thus constituted a "rule ... relating to the pickup of milk." There is no doubt that Schuh understood what Betley meant. The milk receipts include a space for the driver to list the grade of milk received, and Schuh's own president acknowledged that it was the carrier's responsibility to accurately fill out the milk receipts. (Miesen Aff., Ex. B.: C. Schuh Dep. at 45, 49.) Schuh immediately passed the word on to the driver who normally handled the route on which the Klawitter farm was located and instructed him to "change it on the route list." (*Id.*) Unfortunately, other drivers who on occasion handled the route were not advised of the downgrade, and on several occasions the driver incorrectly identified the milk received from the Klawitter farm as Grade A. (*Id.* at 49-56.) The most serious incident occurred on September 8, 2004, when milk from the Klawitter farm was included in a shipment of milk delivered to the Anderson plant in Indiana, a bottling plant operated by the Mideast Milk Marketing Agency. Because it bottles milk for sale to customers, the Anderson plant is not authorized to receive Grade B milk. When advised of the mistake, Schuh's president immediately acknowledged that it was Schuh's fault and that it was "serious."[3] (*Id.* at 64.) On the basis of these undisputed facts, I conclude that Schuh failed to comply with "all policies, rules and regulations issued from time to time by Land O' Lakes relating to the pickup, transportation and unloading of milk."

---

[3] Although Schuh argues that its transportation of milk to an out-of-state plant not owned by Land O' Lakes is not covered by the Agreement, the record reflects that the shipment was first received at Land O' Lakes' Kiel plant where Land O' Lakes employees, relying on Schuh's erroneous Grade A designation on the receipt, prepared a bill of lading for shipment to the Indiana bottling plant. (Miesen Aff., Ex. B.: C. Schuh Dep. at 61.) It is the mislabeling of the milk on the receipt that constitutes the breach and that clearly occurred while Schuh was performing its obligations under the Agreement.

9

Schuh argues that even if it filled out the milk receipts incorrectly, its duty to fill them out correctly was excused by Land O' Lakes' failure, despite its knowledge that Klawitter's farm was producing Grade B milk, to prevent acceptance of the milk as Grade A milk. This argument fails, however, for two reasons. First, it is clear from the undisputed evidence in the record that the operators at the Land O' Lakes plants did not have access to records on individual producers and relied on the milk receipts for determining the grade of milk they were handling. Each load included milk from several farms, and it was the carrier's responsibility to insure Grade A was not mixed with Grade B. (Miesen Aff. Ex. B: C. Schuh Dep. at 30-32.) The argument also fails because it doesn't address the question of whether Schuh breached the Agreement. At most, it raises the question of whether Land O' Lakes failed to mitigate its damages (if Land O' Lakes were seeking any damages). Schuh fails to explain how Land O' Lakes' improper acceptance of the milk hindered Schuh in any way from filling out the milk receipts properly. Accordingly, Land O' Lakes' conduct does not excuse Schuh's performance of its duties under the Agreement.

I therefore conclude that Schuh breached the Agreement. There remains, however, the question of whether Land O' Lakes was justified in terminating the Agreement. On its face, § 11 entitles Land O' Lakes to terminate the Agreement "upon breach by [Schuh]." Taken literally, this provision would entitle Land O' Lakes to terminate the Agreement between the parties for even a trivial and inconsequential breach, with no opportunity for Schuh to cure. At common law, a trivial and inconsequential breach would not justify termination. *E.g., Cloverdale Foods of Minnesota v. Pioneer Snacks*, 580 N.W.2d 46, 49 (Minn. 1998) ("[T]he general rule applicable to contracts is that rescission of a contract is justified only by a material breach or substantial failure in performance."); *United Cigar Stores Co. of America v. Hollister*, 242 N.W. 3, 4 (Minn. 1932) ("[I]t is not every violation of a contract which justifies its rescission."). Minnesota courts have typically interpreted

10

contract provisions–even those that are facially unambiguous–in light of common law rules of contract construction. *See, e.g., Career Resources, Inc. v. Pearson Candy Co.*, 435 N.W.2d 114, 116 (Minn. Ct. App. 1989) (holding that term "within thirty (30) days of employment," while unambiguous on its face, would nonetheless be construed in light of common law rule governing computation of time); *cf. Advantage Consulting Group, Ltd. v. ADT Sec. Systems, Inc.*, 306 F.3d 582, 585 (8th Cir. 2002) ("[A] contract's terms will not be construed so as to lead to a harsh or absurd result."); *Mead v. Seaboard Sur. Co.*, 270 N.W. 563, 565 (Minn. 1936) ("[A] construction is to be avoided which would lead to absurd or unjust results. A contract is to receive a reasonable construction."). Based on the foregoing, I conclude that Land O' Lakes could not terminate the Agreement unless the breach committed by Schuh was material.

Whether a breach is material is generally a question of fact. *Cloverdale Foods*, 580 N.W.2d at 49. Here, however, the parties explicitly agreed that the carrier's obligation to "comply with all policies, rules and regulations issued from time to time by Land O' Lakes relating to the pickup, transportation and unloading of milk" was a "material" term of the Agreement. (Agreement § 3.9.) Moreover, as a result of Schuh's error, Land O' Lakes used its Grade A milk pumping equipment to pump Grade B milk into its Grade A silo in violation of Wisconsin law. *See* Wis. Stat. § 97.20(3)(b); Wis. Adm. Code § ATCP 80.20(2)(a). In addition, Land O' Lakes erroneously qualified the shipment to the United States Department of Agriculture as Grade A milk, thereby entitling Land O' Lakes for reimbursement at the Grade A level under the federal milk marketing order in effect for this region. (Miesen Aff., Ex. I: Knoener Dep. at 44-45.) *See, generally, Alto Dairy v. Veneman*, 336 F.3d 560 (7th Cir. 2003). Finally, Schuh's own president admitted it was a "serious mistake" to deliver Grade B milk to the Anderson plant. In light of these facts, I conclude

11

that Schuh's breach must be considered material and, thus, Land O' Lakes' decision to terminate the Agreement was justified.

The last issue concerns Land O' Lakes' claim for attorneys fees. Land O' Lakes argues that the Agreement's indemnification provision requires Schuh to pay its expenses (including attorney's fees) in defending against Schuh's claim and pursuing its own counterclaim for declaratory judgment. While the indemnification provision is a broad one–it requires Schuh to indemnify Land O' Lakes "against any and all claims, demands, actions, causes of action, losses, liabilities and cost (including reasonable attorney's fees) arising out of or attributable to the conduct, operations or performance of [Schuh]"– I conclude it is not intended to cover disputes between the parties to the Agreement itself. If it did, then even if Schuh prevailed on its claim against Land O' Lakes, Schuh would be required to indemnify Land O' Lakes for attorneys fees as well as any damages it recovered. This is what the Minnesota courts refer to as a "circuity of obligation" which as a matter of law renders indemnification agreements invalid. *See National Hydro Systems v. M.A. Mortenson Co.*, 529 N.W.2d 690, 693 (Minn.1995) ("[A] finding of circuity of obligation will defeat a plaintiff's claim as a matter of law."). Instead, I conclude that under the terms of the Agreement, Schuh was required to indemnify and hold Land O' Lakes harmless for any claim brought against Land O' Lakes by a third party on account of Schuh's conduct in performance of its duties under the agreement. For example, if as a result of Schuh's delivery of Grade B milk to the Mideast Milk Marketing Agency's Anderson bottling plant the Mideast Milk Marketing Agency sued Land O' Lakes for damages, Schuh would be obligated to indemnify Land O' Lakes. But that is not what happened here. This case involves a dispute between two parties to the agreement after one of them elected to terminate it. By its terms, the indemnification provision does not apply.

12

## CONCLUSION

For the foregoing reasons, the court concludes that Land O' Lakes is entitled to a declaration that Schuh breached the Agreement by incorrectly filling out milk receipts on September 2 and September 8, 2004, and that Land O' Lakes properly terminated the Agreement on September 23, 2004. Land O' Lakes' motion for summary judgment is granted, and Schuh's denied, on those claims. Schuh's motion for summary judgment on its breach of contract claims is also denied, and Land O' Lakes' motion is granted with respect to those claims. Schuh's motion is granted, however, with respect to Land O' Lakes' indemnification claim. Land O' Lakes' motion is denied with respect to that claim. The clerk of court shall enter judgment accordingly.

Land O' Lakes has moved to strike the supplemental affidavit (Docket #59) of Evan Schuh, Schuh's president. The matters contained in the affidavit are not material to the disposition of this case. Accordingly, Land O' Lakes' motion is denied as moot.

**SO ORDERED.**

Dated this   24th   day of May, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
